## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| _____ ) | |
| In re: ) | **Bankruptcy No. 15-22330-CMB** |
| ) | |
| **ODYSSEY CONTRACTING CORP.,** ) | **Chapter 11** |
| ) | |
| Debtor. ) | **Related to Doc. No. 156** |
| _____) | |
| ) | |
| **L&L PAINTING CO., INC.,** ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | **Adv. Proc. No. 15-2164-CMB** |
| ) | |
| **ODYSSEY CONTRACTING CORP.,** ) | |
| ) | |
| Defendant, ) | |
| ) | |
| And ) | |
| ) | |
| **FEDERAL INSURANCE COMPANY,** ) | |
| ) | |
| Additional Defendant on ) | |
| Counterclaim. ) | |
| _____) | |

### MEMORANDUM OPINION

On August 25, 2015, Odyssey Contracting Corp. (hereinafter "Debtor" or "Odyssey")

commenced the above-captioned adversary proceeding by filing a *Notice of Removal*, thereby

removing a breach of contract action from the Supreme Court of the State of New York ("State

Court") to this Court. The breach of contract action was filed by L&L Painting Co., Inc. ("L&L")

against Odyssey, and Odyssey, in turn, filed counterclaims against L&L. Federal Insurance

Company ("Federal") was named as an additional defendant on a counterclaim. The dispute arises

1

out of a project to repaint the Queensboro Bridge in New York City. L&L was the prime contractor

on the project, and Odyssey worked as a subcontractor. Federal is L&L's payment bond surety.[1]

The matters presently before the Court are the *Amended Verified Complaint* ("Amended

Complaint," Doc. No. 13-6) and the *Amended Answer and Counterclaims* ("Amended

Counterclaims," Doc. No. 13-9). Related to the removed litigation is the *Debtor's Objection to*

*Claim No. 16 by L&L Painting Co., Inc.* ("Objection to Claim"), which will be resolved with this

adversary proceeding as the claim is based upon the litigation that was removed to this Court.[2]

Trial on these matters was held October 2-5, 2017. Pursuant to the parties' agreement, the issue at

trial was limited to determining which entity was the breaching party. For the reasons expressed

herein, this Court finds Odyssey was the breaching party. Therefore, this adversary proceeding

shall be resolved in compliance with the parties' agreement set forth in the Stipulation and Order

entered September 13, 2017 ("Stipulation and Order," Doc. No. 162).

## Jurisdiction

Pursuant to 28 U.S.C. §§1334(b) and 157(a), this Court has subject matter jurisdiction over

this proceeding. With respect to matters determined to be core, a bankruptcy judge may hear and

determine such matters and enter appropriate orders and judgments. *See* 28 U.S.C. §157(b)(1).

Initially, the parties disputed the core nature of this proceeding as only the Debtor characterized

the proceeding as core. Subsequently, L&L and Federal filed their *Consent to Jurisdiction of the*

*Bankruptcy Court* (Doc. No. 82) followed by a joint filing (Doc. No. 101) in which the parties

submitted that the matters should be deemed core in nature and subject to final adjudication by

this Court. Thus, *even if* this proceeding were determined to be non-core, this Court may

---

[1]     L&L and Federal are commonly referred to collectively as L&L within the parties' filings and are
jointly represented in this litigation.
[2]     *See* Case No. 15-22330, Doc. No. 156. Unless otherwise stated, citations to document numbers
refer to filings in the adversary proceeding.

nonetheless adjudicate the claims upon the parties' knowing and voluntary consent. *See Wellness Int'l Network, Ltd. v. Sharif*, 135 S.Ct. 1932, 1949 (2015).

## Background

This litigation has a lengthy history pre-dating the filing of this bankruptcy case by approximately seven years. L&L commenced this action in the State Court in 2008. In 2011, L&L's Amended Complaint was filed. Odyssey's Amended Counterclaims followed. Then, in 2013, both L&L and Odyssey moved for summary judgment. In a decision dated September 25, 2014, ("Summary Judgment Decision") the State Court granted L&L's motion to the extent that the second, fourth, fifth, and sixth counterclaims were dismissed but denied the motion as to the first, third, and seventh counterclaims. The surviving counterclaims include Odyssey's breach of contract claim alleging underpayment by L&L, its claim for conversion of its property by L&L, and the claim against Federal for payment on the bond. In the same Summary Judgment Decision, Odyssey's motion for summary judgment was denied. Thereafter, both L&L and Odyssey appealed to the Appellate Division of the Supreme Court of the State of New York.

Prior to resolution of the appeals, Odyssey commenced this bankruptcy case on June 29, 2015, by filing a petition for relief under Chapter 11 of the Bankruptcy Code. The filing of the bankruptcy case stayed the progress of the appeals. Then, on August 25, 2015, Odyssey removed the action to this Court. On October 30, 2015, a Consented to Order of Court was entered granting limited relief from stay to conclude the appeals. In addition, the parties agreed to participate in mediation. Ultimately, the Summary Judgment Decision was affirmed, and the attempt at mediation proved unsuccessful. Two additional attempts to mediate also failed to result in a settlement. Accordingly, the matter proceeded to trial on October 2-5, 2017.

The parties' presentations at trial were focused on identifying the breaching party. Pursuant

to the Stipulation and Order, a determination that Odyssey was the breaching party would result

in all pending claims being withdrawn and disposed of in their entirety by both parties. To the

contrary, if the Court determined L&L to be the breaching party, then Odyssey's claims for liability

and/or damages were to be reserved for a determination at a future hearing to be scheduled by the

Court. Post-trial briefing concluded on December 29, 2017, and the matter is ripe for decision.

## **Findings of Fact**

### The Project

L&L is a commercial painting business that has performed work on a number of bridge

painting projects. Transcript A, at 30-31, 34.[3] In the course of bidding on a project, Odyssey was

recommended to L&L as an established bridge painting contractor. Transcript A, at 37. Thereafter,

Alvin Levine, then-president of L&L,[4] contacted Stavros Semanderes ("Semanderes"), president

of Odyssey, to obtain an estimate for subcontracting work. Transcript E, at 9-10. Although L&L

was not awarded that project, L&L once again commenced discussions with Odyssey when the

Queensboro Bridge was coming up for a bid. Transcript A, at 38; Transcript E, at 11.

This time L&L's bid was successful. Pursuant to a contract entered into in the fall of 2003

("Prime Contract," Exhibit 13), L&L became the prime contractor for the New York City

Department of Transportation ("NYCDOT")[5] for the repainting of the Queensboro Bridge (the

"Project"). *See Consolidated List of Undisputed Facts* ("Undisputed Facts," Doc. No. 165), at 2

(¶1), 5 (¶1). The purpose of the Project was to remove the existing lead paint on the steel portions

---

[3]    The Court's citation to trial transcripts is consistent with the parties' agreement (Doc. No. 191) as
follows: Transcript A: 10/2/17 (morning session); Transcript B: 10/2/17 (afternoon session); Transcript C:
10/3/17; Transcript D: 10/4/17; Transcript E: 10/5/17.
[4]    Alvin Levine passed away in February 2007, prior to the commencement of this litigation.
Transcript A, at 42-43.
[5]    NYCDOT is also referred to by the parties as the City or Owner.

of the bridge to repaint with lead-free paint.[6] Among other operations, the Project required

containment and blasting work. *See* L&L PFC, at ¶¶9-11; Odyssey Reply to PFC, at ¶2. The

containment work required the enclosure of the site with tarps and nettings to protect against lead

and other chemicals entering the environment as well as shielding work requiring the installation

of platforms to protect both motorists and pedestrians from falling materials. *See* L&L PFC, at

¶¶9-10; Odyssey Reply to PFC, at ¶2. The blasting work required removal of existing paint through

sandblasting followed by repainting. *See* L&L PFC, at ¶11; Odyssey Reply to PFC, at ¶2.  The

base price of the Project exceeded $167 million. *See* Undisputed Facts, at 2 (¶1), 5 (¶2).

<u>The Subcontracts</u>

After becoming the successful bidder, L&L sought to secure Odyssey as a subcontractor

on the Project. Odyssey's work was to be done at an area designated as Location 2, specifically

the truss and towers, also referred to as the main span of the bridge. *See* L&L PFC, at ¶12; Odyssey

Reply to PFC, at ¶2. The work included the bridge's four towers, which provided structural support

to the bridge and were topped off by spires. Undisputed Facts, at 5 (¶39). Odyssey's two main

operations at its designated location were the preliminary operation of the containment work

followed by the blasting and repainting. *See* L&L PFC, at ¶¶13, 16; Odyssey Reply to PFC, at ¶2.

Although initially Semanderes advised that Odyssey would do this work for a price of $50 million,

he subsequently agreed to accept $40 million. Transcript E, at 12, 16. However, as Odyssey had

no bonding at the time, the parties sought to resolve this issue by breaking the agreement into four

---

[6]      *See Proposed Findings of Fact and Proposed Conclusions of Law by Plaintiff L&L Painting Co.,
Inc. and Additional Defendant on the Counterclaim Federal Insurance Company*, ("L&L PFC," Doc. No.
192), at ¶7; *Odyssey's Reply to L&L's Proposed Findings of Fact and Conclusions of Law* ("Odyssey Reply
to PFC," Doc. No. 205), at ¶1, identifying proposed facts that are not disputed by Odyssey. The Court will
only cite to the parties' proposed findings of fact to support a finding where the fact alleged is undisputed.

subcontracts ("Subcontracts")[7] to enable Odyssey to obtain bonding. Transcript E, at 16.[8] Despite all four documents being available for the parties to execute simultaneously, Odyssey was unable to sign the Subcontracts at the same time without being in conflict with its bond provisions on the first Subcontract. Transcript A, at 64. Although Odyssey began work on the Project in 2004, the three remaining Subcontracts, all dated March 3, 2004, were executed by the parties over a period of two years. *See id.*; Undisputed Facts, at 3 (¶26), 8 (¶65).

The Subcontracts contain the same terms and conditions and differ only in the identification of the different portions of Odyssey's work on the towers and truss of the bridge.[9] Each of the Subcontracts was drafted to provide a value of $8,882,500, "subject to additions and deductions for changes agreed upon or determined…." *See* Subcontracts, Section 3(a).[10] Based upon this amount, the total value of the Subcontracts equals $35,530,000. However, the attachment to each Subcontract provides additional information connecting this amount with the agreed-upon amount of $40 million:

> Contract value had initial base value of $10,000,000.00. A $500,000.00 deduct [sic] has been taken for the absence of a bond at this time. A 6.5% deduct [sic] has been taken on the $9,500,000.00 sales value of the balance for the Project provided wrap-up program.

[7]    The parties dispute whether the Subcontracts represent four separate agreements or one indivisible agreement. The Court's reference to the documents either as Subcontracts in plural form or as individual documents, for example Subcontract 4, is not intended as a determination that the agreements are separate but rather for ease of reference.

[8]    Ultimately, however, no payment and performance bonds were provided on the third and fourth Subcontracts. Undisputed Facts, at 5 (¶11).

[9]    The parties agree on this point. *See* Odyssey Reply to PFC, at 13 nn. 3-4; *Post-Trial Brief by Plaintiff L&L Painting Co., Inc. and Additional Defendant on the Counterclaim Federal Insurance Company and in Support of their Motion under Fed.R.Civ.P. 52* ("L&L Post-Trial Brief," Doc. No. 193), at 7.

[10]    The Subcontracts are marked as Exhibits 23-26. As the contents are mostly identical, reference can be made to any one of these exhibits unless otherwise noted. After these agreements were drafted, the work under one Subcontract was modified, increasing the value of that Subcontract while, correspondingly, the work to be performed under another Subcontract was modified, decreasing the value of that Subcontract. Exhibits 23, 24, 28, 29. The parties commonly refer to the individual documents as Subcontracts 1-4 or I-IV. Due to the amendments, two of the Subcontracts are also referred to at times as Subcontract 1 & 2A and Subcontract 2B, respectively.

*See, e.g.* Exhibit 23, at 1085. Thus, the amount of $35,530,000 represents an unbonded value. Transcript A, at 10. The fully bonded value, with the deduction for wrap-up insurance, totals $37,400,000. Transcript A, at 10; Exhibit 58. From the total contract price, the parties broke down the operations to be performed by Odyssey and the value of such operations for the purpose of facilitating monthly progress payments.

<u>Trade Payment Breakdowns</u>

The Court begins by addressing *L&L's* line item value for the containment operations at Location 2. The particular line item at issue in this case is Item 39832.300102 identified as Class "A" Containment System(s) Location 2 ("Location 2 Containment") with a unit cost of $38 million. *See, e.g.*, Exhibit AAA-1, at NYCDOT000913; Exhibit K, at LLPaint 008795. Notably, in addition to Odyssey, another subcontractor, Alpha Painting & Construction Co., Inc. ("Alpha"), performed work at Location 2. *See* L&L PFC, at ¶6; Odyssey Reply to PFC, at ¶1. Although both Odyssey and Alpha performed containment work, Odyssey's work involved the towers and truss from the upper roadway to the top of the bridge while Alpha's containment work was limited to the roadways and did not include work at the towers. *See* L&L PFC, at ¶¶17-19; Odyssey Reply to PFC, at ¶2. Line item values were broken down for the purpose of monthly billing.

As agreed upon with NYCDOT, *L&L's* value for tower and truss containment work at Location 2 (work to be done by Odyssey) was $17,259,000. Undisputed Facts, at 6 (¶24). This amount was further broken down for the purpose of monthly payment requisitions to the City. Accordingly, for billing and payments, the main span of the bridge was divided into 122 designated locations identified as bays or sections. *Id.* at 2 (¶11). A bay or section is defined as the metal portion of the bridge between two successive panel points. Undisputed Facts, at 2 (¶12). A panel point is the intersection of a horizontal and vertical member of the bridge. *Id.* Thus, the 123 panel

points formed 122 bays. *Id.* at 3 (¶13). Pursuant to L&L's agreement with the City, the total value
of the tower and truss containment work was divided equally among the 122 bays resulting in a
value of $141,467.21 per bay. *See, e.g.,* Exhibit K, at LLPaint 008795; Exhibit AAA-1, at
NYCDOT000916. The containment work at the bridge's four towers was built into L&L's price
for each one of the 122 bays.

During April and May of 2004, L&L and Odyssey were working toward finalizing
Odyssey's payment breakdown. Transcript E, at 19, 23; Exhibits R282, R283, R285, R286, R287.
During the course of negotiations, Semanderes asserted that the main issue was the dollar value
that would be assigned to the truss for containment. Transcript E, at 20. In determining the
appropriate value for the containment portion of its work, Odyssey asserted that it was difficult
work and, as a preliminary operation, Odyssey would benefit most from having money up front
for cash flow to support the job. Transcript E, at 20-21. Accordingly, Odyssey sought to maximize
the amount allocated to the containment operations.

By fax dated May 11, 2004, L&L's draft trade payment breakdown was sent to
Semanderes. Exhibit R285. Therein, L&L proposed a unit cost for Odyssey's containment work
totaling $13,243,520, which was further broken down into two components: (1) the four towers,
valued at 5% per tower, with a total value of $2,648,704 and (2) the truss, valued at a total of
$10,594,816 or $86,136.72 per bay. Transcript E, at 39-40. This proposal, however, did not satisfy
Odyssey's desire to have a significant amount allocated to the containment work. This is clear as
Semanderes provided his proposed trade payment breakdown, which valued the containment work
at $18,700,000, or $153,278.68 per bay, without any separate treatment of the four towers.
Transcript E, at 25-28; Exhibit R286. Semanderes asserts that his proposed payment breakdown

was rejected by L&L on the basis that L&L had already negotiated a payment breakdown between itself and the Owner which could not be changed for Odyssey. Transcript E, at 23-25, 28-29.

The negotiations continued, and a revised payment breakdown was faxed from L&L to Odyssey on May 25, 2004. Exhibit R287. Once again, the proposal breaks out the towers within the containment work; however, the unit cost for containment increased from the original proposal and the percentage per tower decreased to 4%. *See id*. At the bottom of the page, Semanderes initialed the document, indicating his understanding and consent to a payment breakdown which would carve out the containment work on the towers. *See id*.; Transcript E, at 41-42. This indication of consent is confirmed by the credible evidence.

Ultimately, the Court finds that L&L and Odyssey reached an agreement with respect to Odyssey's unit costs for its two primary operations: $16,106,800 for containment[11] and $19,197,200 for the blasting and repainting. *See* L&L PFC, at ¶15; Odyssey Reply to PFC, at ¶2. Further, based upon the credible evidence, the Court finds that the parties' final agreement carved out the tower work from the total unit cost of containment in the amount of approximately $2.5 million or $644,250 per tower. *See* Exhibit 58. As set forth more fully *infra*, this payment breakdown was applied during the course of the Project and reflected in the documentation provided by L&L to Odyssey on a monthly basis relative to Odyssey's progress payments.

Odyssey now asserts, however, that it was misled to believe that the towers were broken out in L&L's agreement with the City as well. Odyssey contends that L&L's representations are consistent with the conclusion that only *one* trade payment breakdown exists (that between the

---

[11]    The Court notes that this amount represents a significant increase from L&L's initial proposal to Odyssey of $13,243,520 for containment with the break out of the tower work resulting in a value of $10,594,816 for the truss work. Exhibit R285. Ultimately, Odyssey was able to negotiate with L&L to obtain a value of $13,529,712 for the truss work alone, an amount which exceeded L&L's initial proposal for *all* of the containment work, including the towers. Exhibit 58.

City and L&L), which was to be mirrored by L&L with the subcontractors.[12] The Court finds the

allegation is not supported by the credible evidence. Specifically, Odyssey has placed a great deal

of emphasis on deposition testimony of Scott Earl ("Earl"), the project manager for L&L. On this

point, Earl testified as follows:

> Q    And then obviously, the agreement between L&L and the City has to be
> *somewhat reflected* in the agreement between L&L Painting and its
> subcontractors, such as Odyssey so that everything works out and fits.
> A    Correct.

Transcript C, at 23 (emphasis added). *See also* Transcript C, at 26 (responding affirmatively to the

question of whether the agreement with the subcontractors had to be "[a] mirror image, or

something like a mirror image with the line items to the City…."). These statements do not support

the conclusion that the payment breakdowns were represented to be identical, only similar for the

purpose of invoicing.

In addition, Odyssey cites to a number of letters which reference the payment breakdown

between L&L and the City and the potential impact on Odyssey. However, these are also

unpersuasive to establish Odyssey's contention. Earl credibly testified with respect to these letters,

and the evidence supports only the conclusion that the payment breakdowns were similar. *See*

Transcript B, at 81-90; Transcript C, at 32-34; Exhibits G, L, M, N, and 37. The fact that L&L

may have been negotiating with Odyssey within the bounds of its own agreement with the

NYCDOT does not necessarily lead to a different conclusion. For instance, Semanderes' assertion

---

[12]    Notably, Odyssey limits its argument in favor of identical payment breakdowns to the contention
that the towers should not have been broken out as separate pay items for Odyssey when the same was not
done for L&L. Odyssey takes no issue, however, with the fact that L&L approved a greater percentage of
the total value of Odyssey's contract for the preliminary containment operation than was permitted by the
NYCDOT for L&L with respect to the same work. Exhibit R316; Transcript D, at 19-20. In the event L&L
and Odyssey *would have* reached an agreement that did not break out the tower work, it is unknown how
that may have impacted Odyssey's ability to negotiate the same substantial amount for containment. As
Semanderes testified, it was to Odyssey's benefit to have more value allocated to this preliminary operation.

that his proposed trade payment breakdown was rejected by L&L on the basis that L&L had already negotiated its prices with the City does not establish support for Odyssey's argument. Notably, Semanderes' proposed value for containment ($18,700,000) *exceeded* the value that was agreed upon for L&L by the Owner ($17,259,000). This supports L&L's rejection and specifically its reference to its own payment breakdown in doing so as Odyssey sought to be paid *more* than L&L would receive for the work. L&L's response reflects the reasonable conclusion that it was bound by the outer limits of what the City would pay L&L when agreeing on the amount it would pay to Odyssey. The Court finds no credible evidence to support Odyssey's contention that it was misled to believe that the containment work on the towers was broken out in L&L's trade payment breakdown with the City nor does the Court find that the trade payment breakdown was imposed upon Odyssey by L&L.[13]

Progress Payments

Based upon the agreed payment breakdown, Odyssey was entitled to seek monthly payments. Section 3 of the Subcontracts addresses payments and provides, in part, as follows:

---

[13]     In its post-trial brief, Odyssey contends that the Court should draw an adverse inference against L&L due to L&L's failure to call Anthony Maracic ("Maracic"), a vice-president of L&L, as a witness. *See Odyssey's Post-Trial Brief* ("Odyssey Post-Trial Brief," Doc. No. 197), at 16. In support, Odyssey asserts that Semanderes testified that Maracic rejected Semanderes' proposed breakdown stating "well we have a breakdown. That's it you know." *Id.* However, upon review of the cited testimony, Semanderes asserted that he provided a schedule of values to Ted Kartofilis ("Kartofilis"), of Odyssey, to give to Maracic and further regarding "the response *from L&L*" he stated "[t]hey didn't accept it. They said well we got a breakdown. That's it, you know." Transcript E, at 25 (emphasis added). The cited testimony does not state that Maracic responded or that L&L's response set forth that its payment breakdown also carved out the tower work. To the extent the "understanding" of Kartofilis is cited, no basis for his understanding was ever established and he testified that he had no involvement in the negotiation of the schedule of values. Transcript D, at 55 and 69-70. Also, as set forth above, the Court finds that the credible testimony with respect to Exhibit G supports only a finding that the parties' payment breakdowns were *similar*, not necessarily identical. L&L contends that it had no reason to call Maracic as it believed that Odyssey failed to meet its burden and further that, having been deposed, there is no basis for concluding that his live testimony would have been non-cumulative. *See L&L Painting Co., Inc.'s and Federal Insurance Company's Reply to Odyssey's Proposed Findings of Fact and Conclusions of Law* ("L&L Reply to PFC," Doc. No. 201), at 13. This Court agrees and finds no basis for an adverse inference. *See Bohm v. Horsley Co.* (*In re Groggel*), 333 B.R. 261, 303-306 (Bankr.W.D.Pa. 2005).

> Subcontractor shall submit an invoice to Contractor on a monthly basis for Work
> performed during the prior month. The Subcontractor's invoice shall be based on
> an itemized breakdown of the Work scope as approved by the Contractor. Invoicing
> will not be recognized until full compliance with invoice breakdown requirements
> are reasonably fulfilled.

For the purpose of monthly billing, Odyssey filled in boxes on a spreadsheet for the individual

work items that it completed during that month and submitted the spreadsheet to L&L. Undisputed

Facts, at 3 (¶19), 7 (¶37). The spreadsheets listed all 122 bays vertically down the left-hand side

of the page while Odyssey's fifteen tasks to be performed were listed horizontally at the top of the

page resulting in a box for each individual task per bay. *Id.* at 7 (¶36). These spreadsheets did not

provide prices or dollar values for the tasks performed. *Id.* at 3 (¶21), 7 (¶39). The Court finds that

the parties treated the completion of these spreadsheets as fulfillment of the monthly invoicing

requirement under Section 3 of the Subcontracts.[14]

Odyssey's spreadsheets were incorporated into L&L's own documentation to Urbitran

Associates, Inc. ("Urbitran"), the City's engineer for the Project, for approval. Undisputed Facts,

at 3 (¶20), 5 (¶4), 7 (¶38). After the spreadsheet approvals were settled, L&L would incorporate

the work performed by Odyssey and approved by Urbitran into its requisitions to the City for

payment. *Id.* at 7 (¶40). Along with its monthly requisitions, L&L submitted to the NYCDOT a

document entitled "Payment Requisition Notes…" for each billing period. *Id.* at 6 (¶21). These

---

[14]      It appears that Odyssey concedes to this as well. *See* Exhibit 62, at ¶¶7,8, and 10. *See also Debtor's Memorandum of Law in Reply* ("Odyssey Pretrial Reply Brief," Doc. No. 137), at 16 ("As required by the subcontracts, the Debtor prepared and submitted monthly invoices to Plaintiff. The invoices did not include the specific amounts owed; instead, they were spreadsheets, breaking down and identifying work completed and approved for payment."). Despite the further directive under Section 3 requiring that Billing Breakdown Form A.I.A. G702-G703 be *attached* to the monthly invoices, it is undisputed that the parties did not comply with this additional requirement. Transcript B, at 64-68. Odyssey suggests that it was L&L that deviated from this particular requirement in an effort to control the payment process; however, there is insufficient evidence to convince the Court of this point. Significantly, there was no evidence of any attempt by Odyssey to use the form, any rejection of the form by L&L, or any dispute prior to this litigation on this basis to the procedure the parties used since the inception of the Project. Further, the use of the form was to be an *attachment* to the Subcontractor's invoice *not in place of* the invoice "based on an itemized breakdown of the Work scope as approved by the Contractor." *See* Subcontracts, Section 3.

notes broke down the line items of work performed during the billing period in greater detail, including specific locations and tasks as well as identification of the subcontractor performing these tasks. *Id.* at 6 (¶22). With respect to the line item at issue in this case for Location 2 Containment, the containment operations of both Alpha and Odyssey were included as part of L&L's completion percentage within L&L's monthly payment requisitions to the City. *See* L&L PFC, at ¶20; Odyssey Reply to PFC, at ¶2. L&L's requisitions to the City were based upon its trade payment breakdown. Transcript B, at 52.

Odyssey was paid pursuant to its trade payment breakdown. Transcript B, at 53. Accordingly, when L&L received approval by Urbitran of work that Odyssey sought to invoice for the month, the approved work would be incorporated into Odyssey's trade payment breakdown in order to determine the dollar amounts that would be paid to Odyssey for that particular month. Transcript B, at 51-53. In doing so, L&L generated a spreadsheet in the form of a requisition and a narrative document. *See id.* and Exhibit 58. The requisition sheet lists the items within Odyssey's scope of work, including the containment operations with a unit cost of $16,106,800. Exhibit 58. The amounts paid to Odyssey were to be based on the unit costs that covered its respective tasks. Undisputed Facts, at 7 (¶44). This procedure was followed throughout the course of the Project. *See* Exhibit 58. Pursuant to the credible evidence, this Court finds that Odyssey never expressed to Earl, as L&L's project manager in charge of the monthly payment applications, any confusion with respect to this payment process. Transcript B, at 43, 53-54.[15]

---

[15]    The testimony of Kartofilis regarding non-matching payments is not credible. While Kartofilis claims that he advised Earl that multiple payments received by Odyssey did not match its requisitions, there is no writing to corroborate the testimony and it is difficult to imagine that Odyssey would not follow-up in an attempt to resolve such an important concern. As Kartofilis describes it, he raised the issue to Earl, Earl said he had no control over what the office did once his paperwork was done, and that was the end of the issue. Transcript D, at 125-29.

Payment Dispute

The parties' relationship began to break down toward the end of 2007. By this time, Ross Levine ("Levine") had become more involved in the Project on behalf of L&L following his father's passing in February of the same year. According to Levine, he recalls concerns at this time regarding Odyssey's work progress and timely completion of the Project. Transcript A, 43-44. Semanderes, however, contends that he observed the amount of work done by Odyssey and realized that "some measure of dollars" was missing. Transcript E, at 29. Based on his observations and the list of items that remained, Semanderes directed an analysis to be done to determine whether there had been underbillings. Transcript E, at 29-30. This task fell on Kartofilis, who had been responsible for providing the spreadsheets of Odyssey's work to L&L for the purpose of monthly billing. Transcript D, at 52; Transcript E, at 29-30. The result of Kartofilis' analysis was a demand letter sent by Odyssey to L&L.

By letter dated February 7, 2008, Odyssey demanded payment in the total amount of $1,397,265.93, which it claimed was due since December 31, 2007. Undisputed Facts, at 3 (¶27), 8 (¶67). In the letter, Odyssey asserted that it analyzed the past billings for the first three Subcontracts (alleged to be substantially complete) as well as change order work and determined that there were underbillings. *See* Exhibit 34. In response, L&L, through Earl, sent an email dated February 12, 2008, stating that additional information would be required to assess Odyssey's claims. Exhibit 35.

Odyssey responded by letter dated February 25, 2008. Exhibit 36. Due to an error discovered in Odyssey's first set of calculations, the total amount sought was reduced to $1,302,969.32. The attachments to the letter were intended to provide L&L with the information Odyssey relied upon in calculating these amounts. Kartofilis explained his calculations as follows:

14

The amounts for Odyssey's claim were ascertained by Odyssey as of December 31, 2007, on a subcontract by subcontract basis, by taking the amounts of each subcontract and deducting the amounts for the remaining work, using the dollar amounts allocated by L&L Painting for those items in the "translations" that L&L Painting had provided to Odyssey purporting to further breakdown of [sic] Odyssey contract price. Based on the foregoing, Odyssey sent its own semi-final invoices to L&L Painting in February 2008 for payment. Each semi-final invoice included only work that had been completed and approved by the NYCDOT.

Exhibit R111, at ¶50 (internal citations and footnote omitted).

Notably, Odyssey's "semi-final invoices" based upon individual Subcontracts were not consistent with the monthly invoicing procedure that had been used throughout the course of the Project. The difficulty in reconciling Odyssey's claims with the invoicing procedure is reflected in L&L's response. Therein, Earl cited to the payment breakdown in place and sought identification by panel point and item that Odyssey believed to have been omitted. Exhibit 37. Notwithstanding L&L's response, by letter dated March 25, 2008, ("March 25th Letter") Odyssey informed L&L that it had substantially completed the first three Subcontracts in addition to extra work for which it was not paid. Undisputed Facts, at 8 (¶54); Exhibit 38.

Upon receipt of Odyssey's initial demand for payment, Levine recalls commencing an investigation. Transcript A, at 44. As he did not have the necessary first-hand knowledge, he reached out to Earl for information regarding Odyssey's approved work. Transcript A, at 44-45. Levine completed his own analysis, which broke down the work by Subcontract and deducted the work that was not complete in a very similar approach to that of Kartofilis which raised objections by Earl. Transcript A, 44-45; Exhibit RR; Exhibit 37. Levine concluded that he could offer approximately $233,000 to Odyssey, which included payments that had not yet been received from the City. Transcript A, at 44-45; Exhibit RR. Earl, however, disagreed with the overall analysis, and testified that he never viewed Odyssey's work by individual Subcontracts but rather as a total

15

scope of work. Transcript C, at 36-37.[16] This is consistent with Earl's role in processing Odyssey's itemized monthly payment requests which did not break down the work by Subcontract but rather identified all work to be completed by Odyssey on a single spreadsheet. At no point during the course of the Project does it appear that either L&L or Odyssey tracked Odyssey's payments on an individual Subcontract basis until Odyssey made its payment demands in 2008.

Notwithstanding Earl's objection and the invoicing procedures, Levine provided his analysis to Odyssey at a meeting held on March 28, 2008, ("March 28th Meeting")[17] in an attempt to work toward a resolution. Transcript A, at 45-46; Exhibit R111, at ¶47. Levine credibly testified that he made an offer to advance funds to Odyssey consistent with his analysis. Transcript A, at 45-46; Exhibit RR. Semanderes, however, recollects the meeting differently. Semanderes asserts that Levine actually conceded that L&L owed Odyssey $741,678. Trancript E, at 31-33. Semanderes relies upon his handwritten notes in support of this contention. Transcript E, at 31-33; Exhibit TT.[18] Semanderes' recollection of the meeting, however, differs from that of Kartofilis. Exhibit R111, at ¶47. The Court does not find Semanderes' notes to be convincing evidence of such an admission by L&L. The purpose of the March 28th Meeting was to come to a resolution. This is consistent with Levine's characterization of his own analysis as a document subject to discussion, not a post-completion audit. Transcript D, at 11. Regardless of the amounts discussed at this meeting, as Semanderes relied upon Kartofilis' calculation that approximately $1.3 million

---

[16]    The Court notes that Levine's testimony regarding the invoicing procedures was at times unclear indicating his lack of involvement in the process throughout the course of the Project. Earl, as the project manager, provided more coherent testimony on this subject.

[17]    Within the testimony, the parties at times seem to mistakenly refer to the date of the meeting as March 27th; however, the parties appear to be referring to the same meeting.

[18]    Although the Transcript provides that the writing on the top of the exhibit reads 3/18/08, Exhibit TT appears to read 3/28/08. Further, Odyssey's proposed findings of fact reflect the meeting referred to is the March 28th Meeting. *See Proposed Findings of Fact and Conclusions of Law* ("Odyssey PFC," Doc. No. 196), at ¶28.

was owed, and it is clear that L&L did not concede to that amount, the March 28th Meeting concluded without resolution. Transcript E, at 33-34.

By letter dated April 1, 2008 ("April 1st Letter"), Odyssey stated that it was terminating *its four subcontracts* with L&L as follows:

> Please be advised that Odyssey Contracting Corp. hereby terminates its four subcontracts with L&L Painting Corp….due to L&L Painting Corp.'s breach by, inter alia, failing to make full and timely payments to Odyssey Contracting Corp. for work performed. Notwithstanding the fact that the termination of the four subcontracts is effective immediately, Odyssey Contracting Corp. will remove its equipment and materials from the site after completion of the punch-list work on subcontracts I, IIA, IIB, and III.

Exhibit 40. Notably, there was no mention of any intention to continue work on the fourth Subcontract, and this letter was never retracted. *See* Exhibit 61, at 100-102. The April 1st Letter further provided that the outstanding payments would be identified in a subsequent letter from counsel. Exhibit 40.

Counsel's letter immediately followed. By letter dated April 2, 2008 ("April 2nd Letter"), Odyssey demanded $5,980,657 for contract work, change order work, retainage, shop steward charges, extra work, and insurance premiums. Undisputed Facts, at 4 (¶31), 9 (¶72); Exhibit 41. Unlike the prior demands, the April 2nd Letter sought amounts allegedly owed on all four contracts as well as the related retainage. The amount sought for contract work and change order work totaled $1,283,152.51 and the amount sought for retainage totaled $1,609,644.88. Exhibit 41.

On April 7, 2008, the parties held a meeting; however, Odyssey did not retract the April 1st Letter. Undisputed Facts, at 4 (¶35), 9 (¶76). The following day, by letter dated April 8, 2008, ("April 8th Letter") L&L denied Odyssey's claims for payment, declared Odyssey in breach of its obligations, and ordered Odyssey off of the Project site. *Id.* at 4 (¶36), 9 (¶77). Odyssey's work on the Project concluded in the early part of April 2008. *Id.* at 3 (¶26), 8 (¶65). It is undisputed that

17

the containment work on two of the four towers was incomplete; further, Odyssey does not contend

that it substantially completed Subcontract 4. *Id.* at 4 (¶33), 5 (¶40). L&L presented credible

evidence in support of its contention that, up to the time of termination, monthly progress payments

were made to Odyssey in accordance with the payment breakdown agreed upon by the parties. *See*

Transcript C, at 97-135; Transcript D, at 6-12; Exhibits R 308-312.

Retainage

On this Project, NYCDOT withheld retainage in the amount of five percent from monthly

payment applications. Transcript B, at 56-57. Similarly, retainage was withheld from Odyssey.

Transcript B, at 57.[19] In June 2006, Odyssey sent a letter to L&L requesting that L&L explore a

way to make use of the retainages which it characterized as a "dormant asset." Exhibit JJ. Odyssey

suggested that the retainage be deposited into an interest bearing account or that collateral be

placed with the Owner in order to have cash released. *Id.* Odyssey's request was met with a verbal

response rejecting the request. Transcript E, at 36-37. It is undisputed that L&L did not release any

retainage to Odyssey. Undisputed Facts, at 8 (¶63). However, it is also undisputed that during the

course of the Project L&L substituted bonds for its retainage in the approximate amount of

$7,423,000. Transcript D, at 176-77; Exhibits R313 and R315.

Project Completion

Ultimately, L&L sent correspondence to the NYCDOT, requesting substantial completion

of the Project be granted. Exhibit 70. A substantial completion inspection was held in July 2009,

and Urbitran advised that a punch list was generated in accordance with that inspection. Exhibit

44; Transcript B, at 59-60. L&L received final acceptance of the Project in 2012. Exhibits 48-50;

Transcript B, at 61-62.

---

[19]     As no payment and performance bonds were provided on Subcontracts 3 and 4, L&L took
additional retainage of 5% as permitted by statute. Undisputed Facts, at 5 (¶11).

## Conclusions of Law

As the purpose of the trial was to determine which entity is the breaching party, this Court limits its analysis accordingly. The Amended Complaint alleges that Odyssey wrongfully terminated and/or abandoned its work at the Project, constituting a breach of the Subcontracts. Exhibit 8, at ¶16. To the contrary, Odyssey alleges that it was L&L that breached the Subcontracts by failing to make full and timely payments to Odyssey, and further asserts that the first three Subcontracts were substantially completed. Exhibit 9, at ¶¶43-45, 49-50. It is Odyssey's position that it did not breach the Subcontracts by termination or abandonment as L&L's material breach relieved Odyssey of any continuing obligation to perform work on the Project. *See* Odyssey Post-Trial Brief, at 21. Therefore, the heart of the parties' dispute is whether Odyssey was appropriately paid by L&L, and this is where the Court's analysis begins.

Odyssey's allegations of underpayment, generally, and achieving substantial completion of Subcontracts one through three, specifically, are consistent with Odyssey's demands prior to termination of the Subcontracts. As set forth above, by its letters dated February 7th and February 25th, Odyssey asserted that, upon its analysis of the first three contracts (alleged to be substantially complete) and change orders, Odyssey determined there to have been underbillings. Exhibits 34 and 36. In the March 25th Letter, Odyssey asserts that full payment for each individual Subcontract is required upon completion, and the first three Subcontracts have been substantially completed. Exhibit 38. The April 1st Letter provided that Odyssey terminated its Subcontracts due to L&L's breach for, *inter alia*, failing to make full and timely payments. Exhibit 40. Further analysis was then provided in counsel's April 2nd Letter, which demanded contract balances and retainage on the four Subcontracts and change orders. Exhibit 41.[20] Since the time of termination, however,

---

[20]    The April 2nd Letter also demanded payment for shop steward charges, extra work, and additional insurance. In the previous letter dated March 25, 2008, Odyssey also asserted that L&L owed Odyssey for

Odyssey has asserted a more specific basis for establishing underpayment by L&L. Odyssey contends that both N.Y. General Municipal Law §106-b(2)[21] and the provisions of the Subcontracts and Prime Contract require Odyssey's trade payment breakdown to be identical to that of L&L. *See* Odyssey Post-Trial Brief, at 7-12. Odyssey contends that by carving out the tower work under Odyssey's containment operations L&L failed to comply with the statutory and contractual mandates resulting in underpayment to Odyssey. The Court will address each of Odyssey's arguments herein.[22]

Substantial Completion

Odyssey characterizes the Subcontracts as four separate agreements, and it is undisputed that Odyssey demanded the release of contract balances and retainages on the ground that Odyssey had substantially completed Subcontracts one through three. *See* Undisputed Facts, at 4 (¶32).[23] To the contrary, L&L asserts that the Subcontracts were not divisible and did not contain their own substantial completion dates.[24] An examination of the applicable contractual provisions is

---

[  ] funds expended on job stewards and additional insurance policies, as well as other miscellaneous costs attributable to L&L's unspecified actions or lack thereof. Exhibit 38. The State Court dismissed Odyssey's claims for shop steward fees and additional insurance premiums. See Exhibit 5, at 17-19. Subsequently, in its Summary Judgment Decision, the State Court determined that Odyssey could not pursue its claims for extra work following a fire on the bridge or for delay damages. Exhibit 11, at 16-25. Thus, those matters have been resolved and will not be revisited.

[21]    The Court notes that the parties cite to the current version of the statute.

[22]    The parties' Subcontracts are governed by the laws of the State of New York. *See* Subcontracts, at Section 26.

[23]    Odyssey maintains, however, that it never *prematurely* demanded retainages and specifically did not demand retainages prior to termination. *See* Odyssey Reply to PFC, at 14. In Odyssey's pre-termination letters, Odyssey characterized the first three Subcontracts as substantially complete; however, no demand was made for retainage. Exhibits 34, 36, and 38. The April 1st Letter set forth Odyssey's termination of the Subcontracts followed by counsel's April 2nd Letter seeking retainages. Exhibits 40 & 41.

[24]    Since the time this case was removed to this Court, the parties have clearly set forth their dispute regarding whether the Subcontracts constitute four separate agreements or whether they are to be read together as one indivisible agreement. Initially, the parties characterized the determination of this issue to be of great significance. *See Pretrial Statement* ("Pretrial Statement," Doc. No. 120), at 24 and *Memorandum of Law on Behalf of L&L Painting Co. Inc., and Federal Insurance Company in Support of Points to be Presented at the September 13, 2017 Pre-Trial Conference* (Doc. No. 161-2), at 2. However, the parties' post-trial briefs clearly state that each believes it can nonetheless succeed on the issue of breach

determinative of Odyssey's alleged entitlement to payment upon substantial completion of individual Subcontracts.

The Court begins with Odyssey's contention that, as there is no ambiguity within the four corners of the Subcontracts, reference to extrinsic evidence is not permitted. *See Debtor's Memorandum of Law* ("Odyssey Pretrial Brief," Doc. No. 121), at 2-3. However, contrary to Odyssey's position, the Court finds that the unambiguous terms of the Subcontracts support L&L's contention that the Subcontracts did not have independent substantial completion dates. Significantly, the Subcontracts incorporate the terms and conditions of the Prime Contract. *See* Subcontracts, Section 1(b). The Prime Contract defines "Substantial Completion" as "the written determination by the Commissioner that the Work required under this Contract is substantially, but not entirely, complete" where "Work" is defined as "all services required to complete the Project in accordance with the Contract Documents…." *See* Prime Contract, Article 2.1.31 and 2.1.33. Further, these definitions appear to be consistent with the provision for final payment under the Subcontracts:

> Upon complete performance of this Subcontract by the Subcontractor *and final approval and acceptance of Subcontractor's Work by the Owner*, the Contractor will make final payment to the Subcontractor of the balance due to it under this Subcontract within forty-five (45) days *after full payment for such Work has been received by the Contractor from the Owner*.

Section 3(c)(emphasis added).[25] The Prime Contract defines "Final Acceptance" as the "final written acceptance of all of the Work by the Commissioner…." Article 2.1.17. Thus, Odyssey's

---

regardless of the Court's determination of whether the Subcontracts are separate or indivisible. *See* Odyssey Post-Trial Brief, at 4 (stating that the determination is immaterial to the issue of breach and primarily goes to the issue of substantial completion and damages); L&L Post-Trial Brief, at 7-8 (stating that even if there were four separate contracts, Odyssey's demands would nonetheless be unfounded).

[25]    Even if these terms created an inconsistency between the Subcontracts and Prime Contract, Odyssey acknowledges that the provisions of the Prime Contract govern. *See* Odyssey PFC, at ¶4 (citing Subcontract Section 1(c) and (d)).

March 25th Letter (Exhibit 38) asserting that "each subcontract requires full payment when it is completed" is inconsistent with the applicable contractual terms, setting forth as prerequisites to final payment to Odyssey both final acceptance by the Owner and full payment by the Owner to L&L. Odyssey failed to establish that these prerequisites were fulfilled.

L&L has consistently maintained that contract balances, including retainages, were not due until substantial completion of all of the work under the Project pursuant to the relevant defined terms of the Prime Contract as well as Articles 21 (Retained Percentage) and 44 (Substantial Completion Payment). Pursuant to Prime Contract Article 14.2, when the conditions are met for a determination that the work is substantially complete, the Commissioner issues a Certificate of Substantial Completion. Accordingly, L&L contends that Odyssey could not achieve substantial completion of individual Subcontracts, which incorporate these terms of the Prime Contract, and Odyssey had no right to demand payments in 2008 based upon substantial completion. In fact, the substantial completion inspection was not held until July 2009, well after Odyssey's departure from the Project. Exhibit 44 (specifically referencing Article 44 of the Prime Contract which provides for Substantial Completion Payment).

Citing Article 16 of the Prime Contract, Odyssey contends that there is an applicable exception. *See* Odyssey Pretrial Reply Brief, at 7; *Odyssey's Reply Brief* ("Odyssey Post-Trial Reply Brief," Doc. No. 204), at 7-8. Article 16 of the Prime Contract provides for occupation or use prior to completion as follows:

16.1    Unless otherwise provided for in the specifications, the Commissioner may take over, use, occupy or operate any part of the Work at any time prior to Final Acceptance, upon written notification to the Contractor. The Engineer shall inspect the part of the Work to be taken over, used, occupied, or operated, and will furnish the Contractor with a written statement of the Work, if any, which remains to be performed on such part. The Contractor shall not object to, nor interfere with, the Commissioner's decision to exercise the rights granted by this article. In the event the Commissioner takes over, uses, occupies, or operates any part of the Work:

> 16.1.1 the Commissioner shall issue a written determination of Substantial
> Completion with respect to such part of the Work;
> 16.1.2 the Contractor shall be relieved of its absolute obligation to protect
> such part of the unfinished Work in accordance with Article 7;
> 16.1.3 the Contractor's guarantee on such part of the Work shall begin on
> the date of such use by the City; and;
> 16.1.4 the Contractor shall be entitled to a return of so much of the amount
> retained in accordance with Article 21 as it relates to such part of the Work,
> except so much thereof as may be retained under Articles 24 and 44.

Exhibit 13, at 00116 (emphasis omitted). Odyssey contends that the testimony of Earl confirms that steps were taken in accordance with Article 16 establishing that the work under Subcontracts one through three was determined to be substantially complete. *See* Odyssey Post-Trial Reply Brief, at 22. In fact, Earl denied that the requirements of Article 16 were met instead referring to anniversary inspections which were conducted under a different provision of the Prime Contract. Transcript C, at 57-58, 65-69.

While inspections of work clearly did take place prior to substantial completion of all of the work, there is no credible evidence that the inspections were pursuant to Article 16. Odyssey failed to produce any evidence that the Commissioner provided written notification to the Contractor of the intent to take over, use, occupy or operate any portion of the work prior to final acceptance triggering the application of this provision of the Prime Contract. Rather, the inspections appear to have been initiated at the request of L&L as opposed to the City. Exhibits AA, BB, CC. Further, while Odyssey contends that the requirement of Article 16.1.1 was satisfied by an email dated February 26, 2008, from Urbitran regarding the "[i]nventory of remaining work on the project," the attached spreadsheet referencing substantially completed work does not appear to be the Commissioner's written determination of Substantial Completion. Compare Exhibit X with Exhibit 44.[26]

---

[26]     In fact, the correspondence dated August 3, 2009, advising that all work was deemed to be substantially completed and accepted following the July, 8, 2009, inspection differentiates between the

Notably, periodic inspections are addressed elsewhere within the Prime Contract under Section 39831 Specification for Painting, specifically Part 3.012. Exhibit 13, at 00597. The provision addresses one year anniversary inspections covering work completed during the previous 12-month period. Under the terms of Part 3.012(E), the Contractor is to be responsible for repairs "for the entire duration of the project and for one year after substantial completion of the contract at no additional cost to the City." However, paragraph E was subsequently deleted. *See* Exhibit 73, at AC-8. A Memorandum of Understanding dated January 14, 2005, clarified the impact of the deletion of the above-paragraph on the periodic inspections and the warranty periods. Exhibit 74. Despite providing for periodic inspections, a warranty period, and ultimately the acceptance of a location of work prior to completion of the entire Project, the memorandum specifically addresses release of retainage as follows: "[R]elease of the retainage will start when the last portion of the project is substantially completed and payment will be done in accordance with the contract documents/specifications." Exhibit 74. Accordingly, even to the extent a certain location would be considered accepted or even substantially completed, the memorandum nevertheless reserved the release of retainage until the end of the Project. While Odyssey attempts to relate the periodic inspections to Article 16 (specifically 16.1.4 relating to retainage), there is no clear correlation. Further, Odyssey failed to identify any other provision of the Prime Contract which would entitle it to payment of contract balances, including retainages, based upon its substantial completion argument.[27]

---

substantial completion inspection and prior inspections: "This acceptance does not include punch list work (resulting from *the* substantial completion inspection, *prior inspection*, or other agency inspections) and/or remaining incidental contract work, if any." *See* Exhibit 44 (emphasis added).

[27]    In addition, Odyssey asserts "that achieving substantial completion of a contract precludes contract termination and limits a contracting party to a specific damage remedy." *See* Odyssey Pretrial Brief, at 12. Notably, it was *Odyssey* that identified the Subcontracts separately and provided that *it* was terminating its *four* Subcontracts. *See* Exhibit 40. Further, in pursuing its argument, Odyssey fails to provide its analysis

In addition, Odyssey's position finds no support in General Municipal Law §106-b. The statute provides as follows: "[w]hen the work or major portions thereof *as contemplated by the terms of the contract* are substantially completed, the contractor shall submit to the public owner and/or his agent a requisition for payment of the remaining amount of the contract balance." General Municipal Law §106-b(1)(emphasis added). Accordingly, this governs substantial completion as between L&L and the NYCDOT, with reference to the terms of the Prime Contract.

The statute also addresses payment by the prime contractor to the subcontractor:

> Within seven calendar days of the receipt of any payment from the public owner, the contractor shall pay each of his subcontractors…the proceeds from the payment representing the value of the work performed…by the subcontractor…and reflecting the percentage of the subcontractor's work completed…in the requisition approved by the owner and based upon the actual value of the subcontract….

General Municipal Law §106-b(2). Despite this derivative entitlement to payment, the subcontractor is not entirely dependent upon the prime contractor's requisition for payment of the contract balance:

> If the contractor has failed to submit a requisition for payment of the remaining amounts of the contract balance within ninety days of substantial completion *as provided in subdivision one* of this section, then any clause in the subcontract between the contractor and the subcontractor…which states that payment by the contractor to such subcontractor…is contingent upon payment by the owner to the contractor shall be deemed invalid.

General Municipal Law §106-b(2)(emphasis added). Notably, in addressing substantial completion with respect to the subcontractor, reference is made to substantial completion under subdivision one as between the owner and prime contractor and with reference to the contract between those parties.[28]

---

in the context of substantial completion as a defined contractual term. To the extent Odyssey raises this as a limitation of damages issue, this Court is not addressing damages in this Opinion.

[28]     Odyssey contends that the spreadsheet circulated on February 26, 2008, (Exhibit X) covered its first three Subcontracts thereby establishing substantial completion of those Subcontracts. *See* Pretrial Statement, at 39; Odyssey Post-Trial Reply Brief, at 7-11. *Even if* the Court found this document to support

fn

In light of the foregoing, the Court considers Odyssey's arguments. Odyssey contends that over $7.5 million in retainage was released to L&L yet no corresponding retainage payments were made to Odyssey despite the fact that L&L billed for approximately 98% of its work under Subcontracts one through three. *See* Odyssey Pretrial Brief, at 11. First, L&L denies that such a "release" occurred and distinguishes its substitution of bonds enabling it to withdraw retainage.[29] Notably, Odyssey failed to produce any credible evidence of a release of retainage to L&L on the basis of substantial completion prior to the termination of the Subcontracts which would have triggered any derivative rights to those funds. Second, L&L asserts that Odyssey is not entitled to a determination of substantial completion based on the percentage of progress payment approvals under Subcontracts one through three, which simply represent estimates subject to correction in the final voucher. *See* Prime Contract, Article 45.3.1 and Subcontract Section 3(b) (providing that partial payments are not approvals or acceptances of work). This Court agrees. Odyssey's contentions are inconsistent with the unambiguous terms of the Subcontracts.

Further, *even if* the unambiguous language of the Subcontracts did not support this conclusion, persuasive evidence exists that the Subcontracts were intended to be treated as part of a single transaction barring substantial completion of individual portions of Odyssey's work.[30]

---

Odyssey's position, to the extent Odyssey contends that L&L failed to submit a requisition for Odyssey's contract balances pursuant to §106-b(2), that argument fails for two reasons. First, §106-b(2) references substantial completion of the contract between the owner and prime contractor. Second, that section provides for a period of 90 days before the contingency of payment by the owner is determined to be invalid. *See* Odyssey Post-Trial Reply Brief, at 11. Accordingly, Odyssey would have no right to demand the payment prior to May 26, 2008, long after the parties' relationship terminated.

[29]    It is undisputed that L&L substituted bonds for retainage. That issue is addressed *infra*.

[30]    The Court notes the existence of a letter agreement between the parties, executed on March 3, 2004, the same date that each of the Subcontracts is dated. *See* Exhibit 21 ("Letter Agreement"). Odyssey has sought to exclude the Letter Agreement from consideration alleging that it constitutes extrinsic evidence barred by the merger clause within the Subcontracts and further that the Letter Agreement was subsequently superseded and contradicted by correspondence from L&L. *See* Odyssey Pretrial Reply Brief, at 1-2; Odyssey Reply to PFC, at 13-14. As far as subsequent correspondence, the Court is unconvinced that the Letter Agreement was superseded (Exhibit 22). Further, the letter by Alvin Levine (Exhibit G) referencing "four separate subcontracts" relates to Odyssey's inability to bond the entire amount which is consistent

L&L asserts, and this Court finds, that where writings form part of a single transaction and are intended to effectuate the same purpose, they must be read together notwithstanding different dates of execution. *See TVT Records v. Island Def Jam Music Grp.*, 412 F.3d 82, 89 (2d Cir. 2005). The Subcontracts are essentially identical with the exception of the specific locations of Odyssey's work on the Project. *See* Exhibits 23-26. Each Subcontract is dated March 3, 2004, despite the fact that the parties executed the Subcontracts on different dates. The Subcontracts are between the same parties and for the same purpose, to set forth the agreement of the parties with respect to Odyssey acting as a subcontractor on the Project. Each Subcontract defines the locations of Odyssey's work on the overall Project. Notably, however, the exhibits to each Subcontract identifying the portions of work to be done by Odyssey explicitly provide that "[t]he scope of work shall include but not be limited to…" the identified items. *See, e.g.,* Exhibit 23, at 1085. In addition, the exhibits to the Subcontracts refer to "each phase" and "work within the scope of that phase." *Id*. Thus, the Subcontracts individually reference the existence of other phases of work to be done by Odyssey despite the identification of distinct locations on the bridge under the broad heading Truss and Towers. The connection is strengthened by the impact of the parties' amendments to the Subcontracts, swapping panel points identified in Odyssey's scope of work as needed from one phase to another and indicating the parties' overall intention that Odyssey would do all of the identified work in the Subcontracts. *See* Exhibits 23, 24, 28, 29. Accordingly, the Court finds no

---

with the Letter Agreement. As to the merger clause in Section 27 of the Subcontracts, the clause is limited in scope and does not clearly extinguish the Letter Agreement. *See Ocwen Loan Servicing, LLC v. ResCap Liquidating Trust* (*In re Residential Capital, LLC*), 533 B.R. 379, 397-98 (Bankr.S.D.N.Y. 2015). L&L characterizes the Letter Agreement as a valid and enforceable agreement by the parties that constitutes a single assent by Odyssey to complete all four Subcontracts which were segregated only for accounting purposes. The Letter Agreement, which specifically refers to the four Subcontracts, was executed at substantially the same time as the first Subcontract (Transcript A, at 41), supporting a finding that the documents should be fully integrated and read and interpreted together. *See ResCap,* 533 B.R. at 396-97. However, as set forth more fully herein, the Court need not rely upon the Letter Agreement to reach its conclusion.

support for Odyssey's contention that it was entitled to payment based upon substantial completion of individual Subcontracts.

Progress Payments

Odyssey nonetheless contends that L&L breached the Subcontracts as L&L's underpayments occurred throughout the course of the Project. *See* Odyssey Post-Trial Brief, at 2. Odyssey's allegation is based on the fact that L&L did not pay Odyssey the same percentage of completion approved and paid by the NYCDOT to L&L for containment work done by Odyssey resulting in systematic underpayment to Odyssey. *See id.* at 1-2. Odyssey reasons as follows: L&L's value for the tower and truss containment work done exclusively by Odyssey was $17,259,000; Odyssey's value for the same work was $16,106,800; Odyssey's value represents 93.3% of L&L's value; therefore, Odyssey is entitled to 93.3% of each dollar L&L receives for containment work which represents work done by Odyssey. *See* Pretrial Statement, at 23-24.[31]

In response, L&L contends that Odyssey's progress payments were governed by its own completion percentage, not that of L&L. *See* Pretrial Statement, at 20. Per L&L, the difference is a result of the parties' individual trade payment breakdowns as follows: the bridge's four towers were broken out as a separate component for Odyssey such that they had to be completed before

---

[31]     The Court notes that at the time of the summary judgment motions Odyssey raised the argument that it was wrongfully paid a lesser percentage of completion. *See* Exhibit 11, at 10. In addressing Odyssey's contention, the State Court found Odyssey's "rather elaborate computations" insufficient to show that it was not paid for its work. *Id.* at 12. While the State Court observed that L&L conceded some amount was due to Odyssey, it was not clear on the record whether that amount was not yet due at the time of termination but rather would only become due following substantial and final completion. *Id.* The State Court went on to observe that, at the time of the Summary Judgment Decision in 2014, the Project had been substantially completed and finally accepted leaving the question of what may be owed to Odyssey in the way of completion costs and retainage as a result. *Id.* L&L takes the position that the remaining contract amounts were used to complete Odyssey's work post-termination and would, at most, be an offset against damages that might be found against Odyssey. *See Pre-Trial Brief of L&L Painting Co., Inc. and Federal Insurance Company* ("L&L Pretrial Brief," Doc. No. 122), at 8. This Court's Opinion, however, is limited to a determination of the breaching party and does not reach the issue of damages.

28

Odyssey was entitled to the related payments whereas, for L&L, the work on the towers was pro-rated across the bridge's sections. *See id.* at 19. Thus, different percentages of completion result.

Odyssey disputes that such a variance is statutorily or contractually permissible. It is Odyssey's position that General Municipal Law §106-b(2) requires that L&L and Odyssey have identical trade payment breakdowns. *See* Odyssey Post-Trial Brief, at 7, 11-12. Odyssey further contends that the contractual language likewise imposes this mirror image obligation. *See id.* at 7-11.[32] Accordingly, Odyssey asserts that L&L, by its own admission, failed to comply with these mandates. *See* Odyssey Pretrial Brief, at 17-18. [33]

Despite Odyssey's contention that "L&L's carve out was unlawful, and the resulting underpayments constitute a material breach which authorized Debtor to terminate the contract,"[34] notably absent from all of the correspondence leading up to termination is any allegation by Odyssey regarding the breakout of the towers. Odyssey may contend that it was previously unaware of the difference in L&L's trade payment breakdown at the time of termination; however, even assuming that is the case, Odyssey's pre-termination demands are curious. Odyssey failed to base its claims on the actual requisitions by pointing to an error, miscalculation, or underbilling.

---

[32]     *See Debtor's Memorandum of Law Simplifying Issues* ("Odyssey Supplemental Brief," Doc. No. 160), at 3-4 (asserting that even if the contractual terms were not consistent with the mandate of General Municipal Law §106-b(2), the statutory provisions would override contractual provisions to the contrary). L&L has asserted that the statute, however, governs time of payment only providing a remedy for non-payment in the form of an interest charge as opposed to providing a basis for breach of contract remedies. *See* L&L Reply to PFC, at 10-11. This Court agrees with L&L's position as a violation of the statute does not appear to provide any basis to establish a breach of the parties' contractual agreement. Nonetheless, as set forth herein, Odyssey failed to establish a violation of the statute as alleged.

[33]     Odyssey alleges that the deposition testimony of Maracic of L&L supports Odyssey's contention. *See* Odyssey Post-Trial Brief, at 10-11 (citing Transcript D, at 14-15). Odyssey's interpretation of Maracic's testimony is misleading. Maracic testified simply that "[w]hatever the City approved my subcontractors were paid." The testimony *does not* state that the subcontractors were paid or entitled to be paid the same percentage of completion as L&L based upon identical trade payment breakdowns. Furthermore, the question leading up to Maracic's answer was as follows: "[Y]ou were paying the…subcontractors for that work *based on the value of their line times*, correct?" Transcript D, at 14-15 (emphasis added).

[34]     *See* Odyssey Supplemental Brief, at 1.

Instead, Odyssey created its own versions of invoices which do not line up with the invoicing procedure used throughout the course of the Project. The contention that L&L breached the contracts by failing to pay Odyssey in the mirror image that it was paid did not constitute the basis for termination but rather appears to be an after-the-fact attempt to justify Odyssey's allegations of underbilling. Nonetheless, the Court finds that Odyssey failed to establish a breach of contract on this basis.

With respect to General Municipal Law §106-b(2), the analysis begins and ends with the language of the statute, which provides as follows:

> Within seven calendar days of the receipt of any payment from the public owner, the contractor shall pay each of his subcontractors…the proceeds from the payment representing the value of the work performed…by the subcontractor…and reflecting the percentage of the subcontractor's work completed…in the requisition approved by the owner and based upon the actual value of the subcontract…and less any retained amount as hereafter described.

Odyssey places significance on the fact that the only requisitions provided to and approved by the NYCDOT were those of L&L and thus concludes that L&L was required to pay Odyssey the same percentage of completion which it billed and was paid by the NYCDOT. While Odyssey cites to a portion of the language of the statute, its argument fails to account for the express language which bases payment on the actual value of the applicable subcontract without any apparent relation to the percentage of completion of the prime contract. In addition, with respect to the line item at issue, the work of both Alpha and Odyssey was reflected in L&L's completion percentage for containment work at Location 2. Significantly, Odyssey failed to cite to any applicable New York case law which interprets the statute in support of its reading, and this Court is unwilling to interpret New York General Municipal Law in a way that New York's courts have not.

Accordingly, this Court finds that General Municipal Law §106-b(2) does not expressly mandate that L&L and Odyssey have identical trade payment breakdowns resulting in identical

percentages of completion. This conclusion, however, does not end the inquiry. The Court must determine whether identical trade payment breakdowns were required by the terms of the Subcontracts and/or Prime Contract as Odyssey alleges.

The Court begins with the provisions of the Subcontracts cited by Odyssey. Section 3(b) of the Subcontracts provides for partial payments to Odyssey each month "in an amount equal to 95 percent of the value, computed on the basis of the prices set forth above, of the quantity of the Work performed hereunder, as estimated by the Owner or Owner's Representative…." Odyssey asserts that Section 3(b) and General Municipal Law §106-b(2) are consistent and equates "quantity of the Work" under Section 3(b) with "the percentage of the subcontractor's work completed" under the statute. *See* Odyssey Post-Trial Reply Brief, at 13. While Odyssey contends that Section 3(b) of the Subcontracts mirrors the mandate of General Municipal Law §106-b(2), Odyssey's argument pursuant to Section 3(b) is no more persuasive than its argument pursuant §106-b(2), as set forth above. While the provision refers to the quantity of work performed as estimated by the Owner, payment is based on "the value, computed on the basis of the prices set forth above" as opposed to any reference to the Prime Contract. Furthermore, earlier in Section 3, addressing the monthly invoices, the Subcontract provides that "[t]he Subcontractor's invoice shall be based on an itemized breakdown of the Work scope as approved by the Contractor." L&L highlights that the itemized breakdown is *as approved by the Contractor*, and based on this provision, L&L asserts that it was permitted to require a more detailed itemization for the work on the towers. *See* L&L Pretrial Brief, at 17. Based on the foregoing, the Court is unconvinced that Section 3(b) of the Subcontracts required the parties to have identical trade payment breakdowns.

Odyssey also cites to Section 1(b) of the Subcontracts, which incorporates "[t]he Contract

Documents including all of the terms and conditions of the Prime Contract" into the Subcontracts.

Further, Section 1(d) of the Subcontracts provides as follows:

> Contractor shall be bound to Subcontractor by the terms of this Subcontract and of
> the Contract Documents between the Owner and Contractor and shall assume
> toward Subcontractor all the obligations and responsibilities that the Owner, by
> those Contract Documents, assumes toward Contractor….

Based on the foregoing, Odyssey cites to provisions of the Prime Contract which it contends

mandate that Odyssey be paid based upon the same percentage of completion as L&L, and

specifically, the same pre-approved percentage per bay. *See* Odyssey Post-Trial Brief, at 9.

Odyssey begins with Article 17.9.1, which specifically addresses payment to

subcontractors, as follows: "The agreement between the Contractor and its Subcontractors shall

contain the same terms and conditions as to method of payment for Work, labor and materials, and

as to retained percentages, as are contained in this Contract." Exhibit 13, at 00117 (emphasis

omitted). At this point, Odyssey's interpretation of the contractual language diverges from L&L's

interpretation, specifically with regard to the phrase "method of payment." Interpretation of

contractual language requires a court to discern the parties' intent based upon the memorialization

of their intent in their writing; further, the language is to be interpreted to render contractual

provisions consistent with one another. *See Ocwen Loan Servicing, LLC v. ResCap Liquidating

Trust* (*In re Residential Capital, LLC*), 533 B.R. 379, 399 (Bankr.S.D.N.Y. 2015).

According to Odyssey, the applicable "method of payment" is set forth in Article 41 and

in the Specification for Lead Paint Removal at Section 39832. Odyssey Post-Trial Brief, at 7.

Article 41 addresses L&L's breakdown of its bid price as follows:

> 41.1    …Contractor shall submit to the Resident Engineer a breakdown of its bid
> price, or of lump sums bid for items of the Contract, showing the various operations
> to be performed under the Contract…and the value of each of such operations, the

total of such items to equal the lump sum price bid. Said breakdown must be approved in writing by the Resident Engineer.

41.2    No partial payment will be approved until the Contractor submits a bid breakdown that is acceptable to the Resident Engineer.

41.3    The Contractor shall also submit such other information relating to the bid breakdown as directed by the Resident Engineer. Thereafter, the breakdown may be used only for checking the Contractor's applications for partial payments hereunder, but shall not be binding upon the City, the Commissioner, or the Engineer for any purpose whatsoever.

Exhibit 13, at 00144-45 (emphasis omitted). Accordingly, L&L did provide a breakdown of its bid in compliance with this Article. *See* Exhibit K.

Odyssey further contends that the precise method of payment for containment work is set forth in Section 39832, the Specification for Lead Paint Removal, under the heading Basis of Payment. Odyssey Post-Trial Brief, at 8. Under subsection D (entitled Containment System), reference is made to progress payments:

Progress payments will be made. They will be based upon percentage of completion. The percentage of the total containment cost(s) represented by each section of the bridge (e.g., each span) will be established in advance, and the lump sum price(s) divided accordingly.

Exhibit 13, at 00664. Odyssey concludes from this provision that (1) the containment work was to be paid based upon percentage of completion and (2) the containment costs were to be allocated evenly per span or bay without any carve out of the towers. Odyssey Post-Trial Brief, at 9. Thus, Odyssey asserts that L&L's trade payment breakdown provided a value per span of $141,467.21 without any distinction between the tower containment work versus truss containment work. *See id.*

Odyssey contends that the terms of Article 41 and Specification Section 39832, subsection 5(D)(4), establish the applicable "method of payment" for containment under Article 17.9.1, which is expressly incorporated into Odyssey's Subcontracts. *See id.* Accordingly, Odyssey asserts that

it should have been paid in like-fashion in the amount of $132,022.94 per bay (i.e. 93.3% of $141,467.21), with no carve-out of the towers. *See id.* Curiously, as Odyssey acknowledged that it examined all of the Prime Contract documents at the time of entering into the Subcontracts, there is no evidence that Odyssey believed this provision applied as it now contends while negotiating its trade payment breakdown with L&L.[35]

L&L disputes Odyssey's broad interpretation of "method of payment" and takes a more narrow view guided by the same terminology used elsewhere in the Prime Contract. Specifically, L&L points to Articles 25 and 26 regarding the methods of payment for extra or changed work as, for example, unit price, fixed price, cost plus a percentage, as opposed to payment amounts that are subsequently determined. *See* L&L Post-Trial Brief, at 25. Upon review of Article 26, L&L's argument is persuasive as this provides for consistent interpretation of the same terminology within the Prime Contract. *See* Exhibit 13, at 00129 (providing pursuant to Article 26.5 that "[w]here the Contractor and the Commissioner can agree upon another method of payment for Extra Work…such method…may, at the option of the Commissioner, be substituted for the cost plus a percentage method….). Accordingly, L&L contends that there was compliance with Article 17.9.1 as both the Prime Contract and Subcontracts contained the unit price method of payment. In addition, Article 17.9.1 refers to "method of payment for Work" and "Work" is a defined term,

---

[35]     The Court notes that pursuant to Subcontract Section 1(f), Odyssey acknowledged as follows: …[Odyssey] has independently assured itself that all of the Prime Contract documents have been available to it and confirms that it has examined all such documents and agrees that all of the aforesaid Prime Contract documents shall be considered a part of this Subcontract by reference thereto and [Odyssey] agrees to be bound to the Contractor and Owner by the terms and provision[s] thereof so far as they apply to the Work hereinafter described, unless otherwise provided herein.
If Odyssey believed its progress payments were to be based upon the Specification and specifically that the Specification should be interpreted to require containment costs to be divided evenly per bay without carving out the tower work, Odyssey could have raised this at the time it was clearly negotiating its trade payment breakdown with L&L.

meaning "all services required to complete the Project…." Article 2.1.33. Therefore, L&L contends that the method of payment is used in reference to all of the "Work" as opposed to specific line items contrary to Odyssey's view. *See Post-Trial Reply Brief by Plaintiff L&L Painting Co., Inc. and Additional Defendant on the Counterclaim Federal Insurance Company*, (Doc. No. 200), at 9-10.

Based upon the foregoing, the Court finds that the meaning of "method of payment" is best determined from its use within the Prime Contract itself. This is consistent with the principle that the meaning of a phrase used in one sense will generally be given the same meaning throughout the contract. *See Two Farms Inc. v. Greenwich Ins. Co.*, 628 F.App'x 802, 805 (2d Cir. 2015). If the intention was to require an identical bid breakdown, then it would seem appropriate to mirror the language of Article 41 rather than require the same terms and conditions as to method of payment. Odyssey points to no reason why the phrase should not be interpreted consistently throughout the Prime Contract.

Furthermore, the Court finds Odyssey's interpretation of Specification 39832 unpersuasive. While the language provides for each span of the bridge to be allocated a percentage of the total containment costs, the language in no way mandates that each span be designated an *equal* value. Despite the fact that L&L's trade payment breakdown ultimately provided a value per span of $141,467.21, there was a time when a change to this payment breakdown was suggested by the City. The City's consideration of "a more accurate breakdown in accordance with the individual height of each section of the upper truss" suggests that while a value had to be assigned for the purpose of progress payments it was not mandated to be equally divided. Exhibit M. Accordingly, the Court finds that the Prime Contract did not mandate that each span of the bridge be assigned an equal value.

Odyssey failed to establish that any provision of the Subcontracts or Prime Contract required the parties to have identical payment breakdowns. Accordingly, the Court finds that the contractual language did not prohibit the carve-out of the tower work for Odyssey, and Odyssey cannot establish a breach of contract pursuant to that theory.

Furthermore, to the extent Odyssey contends that L&L's own records demonstrate underpayments to Odyssey in the minimum amount of $1,102,964, that argument too is unconvincing. *See* Odyssey PFC, at ¶22 (citing to Exhibit TTTTT). Odyssey seeks to demonstrate underpayments on an individual Subcontract basis by piecing information together from various sources. However, throughout the course of the Project, payments were not made on an individual Subcontract basis but rather on the total scope of work pursuant to the established invoicing procedure rendering such a comparison difficult.[36] Further, Odyssey's calculation largely relies on Levine's analysis (Exhibit RR) which was created for the purpose of the March 28th Meeting. Both parties have acknowledged errors in the document, and the Court finds that the analysis is unreliable to establish amounts owing to Odyssey. This is consistent with Levine's characterization of his own analysis as a document subject to discussion, not a post-completion audit. Transcript D, at 11. In addition, Odyssey seeks to rely on an inexact amount used as a comparison in L&L's brief to establish the amount of work allegedly in place under Subcontract 4. The Court finds the most reliable documents demonstrating Odyssey's entitlement to payment are its spreadsheets identifying tasks completed throughout the course of the Project and the corresponding requisitions applying Odyssey's trade payment breakdown. Further, pursuant to Section 3 of the Subcontracts,

---

[36]    Notably, reconciling Odyssey's own figures can be difficult. In reference to the March 28th Meeting, Kartofilis asserted that the major difference between the parties' analyses at the time was with respect to the fourth contract and was a difference of about one million dollars. *See* Exhibit R111, at ¶47. However, just days after the meeting, in counsel's April 2nd Letter, Odyssey asserted that the following amounts were due under Subcontract 4: $51,308.82 in contract balances and $150,909.65 in retainage. *See* Exhibit 41.

invoicing would not be recognized unless in compliance with the invoice breakdown requirements. Odyssey failed to demonstrate underpayment based on the established procedure for invoicing at the time it demanded payment from L&L and subsequently sent its termination letter on April 1, 2008, based on those unsubstantiated demands.[37] Furthermore, L&L presented credible evidence in support of its contention that, up to the time of termination, monthly progress payments were made to Odyssey in accordance with the payment breakdown agreed upon by the parties. *See* Transcript C, at 97-135; Transcript D, at 6-12; Exhibits R 308-312.

<u>Release or Withdrawal of Retainages</u>

While Odyssey contends that it did not terminate the Subcontracts based on L&L's failure to pay retainages, it nonetheless contends that it was entitled to retainages. *See* Odyssey Post-Trial Reply Brief, at 5-12. Prior to the termination of the Subcontracts, there is no credible evidence indicating that retainages were released on the basis of substantial completion or on the basis of work performed at all. Specifically, under the terms of the Prime Contract, Odyssey failed to demonstrate that the release of retainage was based upon substantial completion of any part of the work pursuant to Article 16, as set forth more fully above, or all of the work pursuant to Article 44. No evidence connects the withdrawal of retainages to a certificate of substantial completion by the Commissioner, a substantial completion requisition by L&L, or the issuance of a voucher calling for payment to L&L. Rather, L&L substituted bonds *in exchange* for cash retainages held by the City. This distinction is of significance as General Municipal Law §106-b addresses payments whereas the withdrawal of retained percentages is governed by an entirely separate section, General Municipal Law §106. Therefore, the latter statute governs in this instance.

---

[37]    To the extent Odyssey previously asserted an entitlement to payment for alleged extra work (*see* Odyssey Pretrial Reply Brief, at 17-18), no credible evidence was produced in support of that assertion. Notably, any argument in support of payment for extra work is absent from Odyssey's post-trial submissions.

Section 106 provides, in pertinent part, as follows:

> [T]he contractor may, from time to time, withdraw the whole or any portion of the amount retained from payments to the contractor pursuant to the terms of the contract, upon depositing with the fiscal officer of the political subdivision or district therein…(1) bonds or notes of the United States of America, or obligations, the payment of which is guaranteed by the United States of America, or (2) bonds or notes of the state of New York, or (3) bonds of any political subdivision in the state of New York, of a market value equal to the amount so withdrawn.

It is undisputed that L&L availed itself of this opportunity during the course of the Project. Notably, the statute does not speak in terms of payment for work performed. Thus, L&L asserts that, as this was not a release of retainage pursuant to §106-b, but rather a substitution of one form of collateral for another under §106, Odyssey was not entitled to be paid from the funds withdrawn. *See* L&L Post-Trial Brief, at 10-11. The Court agrees. L&L's substitution of bonds for cash retainages did not create payment rights for Odyssey.

Odyssey counters that it had an absolute right to withdraw cash retainages under the statute which L&L unjustifiably denied. Specifically, Odyssey contends that it made a formal request to L&L by letter dated June 1, 2006. *See* Odyssey Post-Trial Reply Brief, at 6. Within the letter, Odyssey observes that a substantial amount of money is tied up in retainage, and Odyssey sought to convert a dormant asset into a productive asset. *See* Exhibit JJ. Further, Odyssey requested that L&L "explore with the owner ways and means to get this done." *Id.* Odyssey suggested depositing the retainage into an interest bearing account or substituting bonds as collateral. *Id.* The letter does not read as a "demand" or a tender of securities but rather an inquiry. Nonetheless, Odyssey asserts that L&L's denial violated General Municipal Law §106.

Odyssey cites to no binding or persuasive authority in support of its contention that the statute provides a subcontractor with an absolute right to provide bonds in exchange for the withdrawal of retainage. Odyssey's only alleged support for its position that its request could not

be refused are opinions of the New York State Comptroller and New York Attorney General, both from 1963. Notably, however, the citation to the Comptroller's opinion addresses the refusal of a political subdivision and the citation to the Attorney General's opinion addresses the refusal of a village. Neither the quotations within Odyssey's brief nor the express language of the statute address a subcontractor's right to withdraw retainage nor the effect of the prime contractor's withdrawal of retainage on the subcontractor.

To the extent Odyssey cites to *Fed. Ins. Co. v. Cnty. of Westchester*, 921 F.Supp. 1136 (S.D.N.Y. 1996), in support of its contention that L&L misappropriated Odyssey's interest, the case does not support Odyssey's position. The case cites to the language of §106 with respect to the responsibility of a fiscal officer of a political subdivision or district to collect interest and income on retainage obligations and pay the same, when and as collected, to the contractor. *Id.* at 1140. This case provides no support for Odyssey's contention that L&L misappropriated monies due to Odyssey. Odyssey has not established that amounts were due Odyssey based upon L&L's substitution of bonds for retainage nor has Odyssey established that it had an absolute right to withdraw retainage.

<u>Breach and Termination</u>

Odyssey has maintained throughout this action that it had no continuing duty to perform under the Subcontracts as L&L's failure to properly pay constituted a material breach relieving Odyssey of any further contractual obligations. *See* Odyssey Post-Trial Brief, at 21.[38] However, as set forth above, Odyssey failed to establish that L&L breached by underpaying Odyssey. To the contrary, L&L produced credible evidence that it paid Odyssey pursuant to the agreed-upon

---

[38]     Despite this assertion, the Court notes that the Subcontracts required the continuation of work during the pendency of a payment dispute. *See* Subcontracts, Section 30.

payment breakdown. Accordingly, the Court must address the impact of Odyssey's April 1st

Letter, which provides, in pertinent part, as follows:

> Please be advised that Odyssey Contracting Corp. hereby terminates its four
> subcontracts with L&L Painting Corp….due to L&L Painting Corp.'s breach by,
> inter alia, failing to make full and timely payments to Odyssey Contracting Corp.
> for work performed. Notwithstanding the fact that the termination of the four
> subcontracts is effective immediately, Odyssey Contracting Corp. will remove its
> equipment and materials from the site after completion of the punch-list work on
> subcontracts I, IIA, IIB and III.

Exhibit 40. Significantly, while providing for some continuation of work despite termination, the

letter explicitly terminates the fourth Subcontract without any express intent to continue work on

that Subcontract. This letter was never retracted. *See* Exhibit 61, at 100-102; Transcript A, at 50-

51.[39] The Court finds the statement was a positive and unequivocal proclamation of Odyssey's

intention with respect to the majority of its remaining scope of work on the Project regardless of

whether Odyssey may have continued some work on the Project after the April 1st Letter.[40]

Odyssey failed to produce any credible evidence that the statement was withdrawn by its words or

conduct. *Even if* the Court accepted Odyssey's characterization of its April 1st Letter as a "wake-

up call" or negotiation tactic (Exhibit 61, at 100-102), by conditioning its future performance on

unjustified payment demands, the threat of nonperformance constituted a repudiation of the

contract.[41] *See Mometal Structures, Inc. v. T.A. Ahern Contractors Corp.*, No. 09-CV-2791(MKB),

2013 WL 764717, at *7-8, 2013 U.S. Dist. LEXIS 27797, at *21-25 (E.D.N.Y. Feb. 28,

---

[39]     Further, the termination of the Subcontracts was *confirmed* by counsel's April 2nd Letter, which
referenced the April 1st Letter's termination of all four Subcontracts, alleged that L&L breached the
Subcontracts causing damages to Odyssey, and advised that Odyssey would pursue all available rights and
remedies against L&L unless immediate payment was made. *See* Exhibit 41.
[40]     Upon breach of a contract, the injured party must make an election to either terminate or affirm the
contract; however, the contract cannot be treated as both broken and subsisting at the same time. *See
Rebecca Broadway L.P. v. Hotton*, 37 N.Y.S.3d 72, 79 (N.Y.App.Div. 2016).
[41]     Accordingly, having reached this conclusion, the Court need not address L&L's alternative
argument that Odyssey abandoned the Project. *See* L&L Post-Trial Brief, at 16-17.

2013)(finding subcontractor liable for breach of contract for its repudiation of the subcontract despite the fact that it did not cease performance at any point prior to contractor's termination of the subcontract).

"[A] repudiation discharges the nonrepudiating party's obligations to render performance in the future…." *See Computer Possibilities Unlimited, Inc. v. Mobil Oil Corp.*, 747 N.Y.S.2d 468, 475 (N.Y.App.Div. 2002). Thus, the repudiation by Odyssey would render even a subsequent wrongful termination of the Subcontracts by L&L non-actionable as a breach of contract. *Id.* at 476. However, the question of who terminated the agreements now appears to be a non-issue. Odyssey has taken the position that it terminated the Subcontracts.[42] The Court finds that this is consistent with the credible evidence. Therefore, based upon the foregoing, Odyssey breached and terminated the Subcontracts with L&L.

## Conclusion

Based upon the foregoing, Odyssey failed to establish that L&L breached the Subcontracts by underpaying Odyssey. Rather, it was Odyssey that breached the Subcontracts by making unjustifiable payment demands and terminating the Subcontracts based on those demands. The

---

[42]     The Summary Judgment Decision set forth the parties' arguments on the issue of termination, the existence of the termination procedure within the Subcontracts, and the factual dispute with respect to repudiation. *See* Exhibit 11, at 12-16. Notably, the termination procedure set forth in Section 6(c) of the Subcontracts only appears to apply where *L&L* seeks to terminate the Subcontracts for Odyssey's default. In subsequent filings, Debtor has contended that it terminated the agreements. *See* Odyssey Pretrial Reply Brief, at 12 ("Had the money owed been paid and adequate assurance been given that payments would be made in accordance with the contractual provisions at issue, the contract could have been reinstated."); *id.* at 14 ("If, as the Debtor has shown, the Plaintiff failed to make the payments required by the contractual agreements, then the Debtor was justified with terminating the agreements and could not be in breach. Thus, any 'cure' is irrelevant. Cure would only be relevant if the Debtor effectively retracted [any] repudiation.[]")(citation omitted). *See also* Odyssey Supplemental Brief, at 6 ("The above provision is straightforward – §6(g) only applies where the Contractor – i.e. L&L – wrongfully terminates the contract. Here, it is uncontested that **Odyssey, *not L&L***, terminated Subcontract 4 on account of L&L's payment failures. In fact, L&L's own breach of contract claim is based on Odyssey's alleged wrongful termination of the contract. Simply put, because Odyssey declared termination, §6(g) is inapplicable….") (emphasis in original).

parties, having agreed to limit the issue at trial to a determination of which party breached, shall resolve this adversary proceeding and the related Objection to Claim in accordance with the Stipulation and Order entered September 13, 2017.[43] An Order will be entered consistent with this Memorandum Opinion.


Date: <u>March 20, 2018</u>                                    __/s/ Carlota M. Böhm_____
                                                                                    Carlota M. Böhm
                                                                                    United States Bankruptcy Judge




**MAIL TO:**

Office of the United States Trustee
Chris Georgoulis, Esq. and James Lainas, Esq.
Robert O Lampl, Esq. and John P. Lacher, Esq.
Allen J. Ross, Esq., Charles Fastenberg, Esq., and Jose Aquino, Esq.
Jeffrey W. Spear, Esq., and Joel Walker, Esq.




FILED
3/20/18 2:27 pm
CLERK
U.S. BANKRUPTCY
COURT - WDPA

---

[43]     Based upon the determination that Odyssey was the breaching party, this Court need not address any entitlement to an insurance rebate or the alleged conversion of equipment. *See* Stipulation and Order. These were allegations raised post-termination.